# IN THE COURT OF APPEALS OF IOWA

No. 15-1652
Filed November 25, 2015

**IN THE INTEREST OF D.G.,**
**Minor Child,**

**A.G., Mother,**
**Appellant.**

_____

Appeal from the Iowa District Court for Ida County, Mary L. Timko, Associate Juvenile Judge.

A mother appeals from an order terminating her parental rights to her child. **AFFIRMED.**

Marvin W. Miller Jr. of Miller, Miller, Miller, P.C., Cherokee, for appellant mother.

Thomas J. Miller, Attorney General, and Kathrine S. Miller-Todd, Assistant Attorney General, for appellee State.

Lesley D. Rynell of the Iowa Public Defender, Sioux City, attorney and guardian ad litem for minor child.

Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

A mother appeals from the termination of her parental rights. She contends grounds for termination were not proved and the juvenile court erred in not allowing her the full six-month extension it had granted in February 2015. We disagree and therefore affirm.

Our review of termination decision is de novo. *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014).

After reviewing the record, we conclude grounds for termination exist under section 232.116(1)(h) (2015). Under that subsection, termination may be ordered when there is clear and convincing evidence a child age three or younger, who has been adjudicated in need of assistance and removed from the parent's care for the last consecutive six months, cannot be returned to the parent's custody at the time of the termination hearing. *See* Iowa Code § 232.116(1)(h). The child was under the age of three at the time of the termination hearing. The child was adjudicated a child in need of assistance on October 22, 2013. The mother voluntarily placed the child with relatives in June 2014,[1] and the child remained in the relatives' care in 2015.[2] The mother contends, however, that the juvenile court erred in finding the child could not be returned to her at present and in not granting her additional time to seek reunification. We find otherwise.

---

[1] Despite ongoing involvement with juvenile court and the Department of Human Services (DHS), the mother did not inform the court or DHS she had left the child with relatives until July 2014.
[2] The juvenile court modified custody in September 2014, placing the child with the DHS for relative placement.

At a July 2014, family team meeting, the mother reported that she was involved with a man named Kyle. The father had made allegations of such an involvement throughout the case. Kyle had several prior criminal charges, and the mother was advised then that a relationship with Kyle was a barrier to reunification with the child.

By February 2015, it appeared that the mother was adequately addressing the issues that led to the adjudication. As noted by the juvenile court in the later termination order:

> [The mother] stated she had been working with [Counsel Against Abuse and Sexual Assault] CAASA. Her meetings with CAASA were in exchange for therapy. At the family team meeting, [the mother] had agreed to meet with CAASA at least two times a month. She reported she was working with Craig Bursell of Eckerd regularly. She reported they were working on budgeting, relationships and parenting.
> [The mother] reported at the permanency hearing that she and [Kyle] were not together as a couple, but did have contact. (This was not an accurate rendition of the situation at that time as Kyle testified at the termination of parental rights hearing that beginning in January of 2015 to the time of the termination of parental rights proceeding he had spent the evening with [the mother]. He had been with her quite a bit. He also had contact with [the child] when [the mother] had him on visits. He reportedly helped [the child] learn how to ride a bike, and he would take [the child] to the playground. He reported spending the evening with [the mother] while [the child] was there. He did indicate, however, that he was never left alone with [the child]. Again, none of this information was forthcoming from [the mother] at the time of the permanency hearing.) The Court admonished [the mother] at the permanency hearing to be honest about any relationship she had so that it could be dealt with and worked through. Again, although [the mother] knew she was pregnant [by Kyle], she omitted telling anyone.

The juvenile court granted the mother an additional six months because of her housing, her new employment, her report of work with the CAASA and the provider, and her lack of relationship with Kyle. The juvenile court ordered that

the mother was not to allow contact between the father and child that was not preapproved by DHS, she was to cooperate consistently with CAASA, she was not to allow any persons around the child to care for him or to be able to establish a relationship with him that had not been preapproved by DHS and the guardian ad litem, and she was not to allow any persons to reside in her home or stay overnight without preapproval of DHS. It soon became evident the granted extension was based upon false premises.

On April 6, 2015, the State filed a motion to expedite modification of permanency order, which the court granted.

A termination hearing was held on June 23 and July 28, 2015. By the time of the termination hearing, while the mother had been in an appropriate apartment for the last nine months and had held the same job for about three months, her participation in CAASA services were not as she had reported. She had only attended two sessions since May 2015 and had not attended CAASA services for several months prior to May (despite such services having been recommended since the beginning of the case in 2013). Moreover, the mother had only had her first mental health appointment the week before the first termination hearing, and she told the DHS worker in May 2015 that she would stop therapy if her parental rights were terminated. It was in March 2015 that the mother told the DHS worker that she was pregnant with Kyle's child. Although the mother reported this pregnancy, she also reported that she was not in a relationship with Kyle. She told the DHS worker she was considering moving to Missouri; she did not want to be around Kyle because she saw the same tendencies in him that she had seen in the child's father. Then, in April 2015,

DHS learned that the mother was allowing Kyle to be around the child during unsupervised visits. In June 2015, the DHS worker learned there had been an encounter between the mother and Kyle in May that raised concerns of domestic abuse. The DHS worker testified it was difficult to trust the mother, the worker did not believe the child could be returned to the care of the mother at the present time, and did not believe the mother could provide stability for the child in the next two months.

Kyle testified at the initial termination hearing that he was in a relationship with the mother. He acknowledged that he had had quite a bit of contact with the child in the past while he was visiting with the mother and that he had spent the night at the mother's home when the child was present. He acknowledged having assaulted his former girlfriend, but claimed he was intoxicated at the time and an alcoholic, and he believed that she was cheating on him. He claimed to be a different person now, stating he had participated in a batterer's education program, substance abuse treatment, and parenting classes. On cross examination, he stated he was not in AA meetings, he did not have a sponsor, and he did not work the twelve-step program. He could not give a sobriety date because he still drank beer on the weekends, he sometimes had a beer after work, and he was last drunk on his birthday in February 2015. He reported that the incident in May between the mother and him was because he thought she was cheating on him with a coworker. Kyle stated he and the mother had been in a relationship on and off since September 2013 and that the relationship became "pretty serious" in December 2014. Kyle did not know the mother had been denying being in a relationship with him.

The mother testified on the second day of the termination hearing that she was ready for her child to come home and that she could provide a safe home for him and for the baby due in October. She stated she did not plan to live with Kyle in the near future even though she had been searching for a home with him in April 2015 and referring to him as her fiancé. She acknowledged that prior to the last three months, she had not always put her child first in her life, but she had made changes in her life. She had participated in three CAASA sessions and two therapy sessions since the last termination hearing. She admitted that at every family meeting CAASA services and individual counseling were discussed but she had delayed participating in them. The mother did not deny that she had lied to the DHS worker or that she should not have allowed so much unauthorized contact between Kyle and the child. She acknowledged that she and Kyle had broken up after the last termination hearing because of the testimony presented at that hearing. However, she believed they were now in a stable relationship.

The mother has not adequately addressed issues of instability, co-dependency, and placing her own wants and needs before her child's. We, like the juvenile court, conclude the child cannot be returned to the mother's care at present. While the mother contends the court should have granted an extension, the juvenile court wrote:

> [The parents] wasted so much time—time that has translated into [the child] living in limbo much too long. The Court was more than willing to allow [the mother] the extra six months when it appeared that she may have fully gotten the message, even though her effort at that time was miniscule. But when it came to light that the reasons given for the extra six months were based on falsehoods, the Court could no longer ignore what was in the best

interest of [the child]—that he be given the opportunity to establish permanency and stability in his life. [The child] can no longer afford to wait on the maturity of his parents. The waiting has already taken its toll on him.

Further time is not warranted. While the law requires a "full measure of patience with troubled parents who attempt to remedy a lack of parenting skills," this patience has been built into the statutory scheme of chapter 232. *See In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000). "Time is a critical element," and parents simply "cannot wait until the eve of termination, after the statutory time periods for reunification have expired, to begin to express an interest in parenting." *See id.* at 495. The child is in need of permanency and should not have to wait any longer.

**AFFIRMED.**